## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 14-20877-CR-UNGARO/OTAZO-REYES

UNITED STATES OF AMERICA,

v.

ALBERTO ANTONIO RODRIGUEZ,

      Defendant.

_____/

### SECOND ORDER RE: COMPETENCY

**THIS MATTER** came before the undersigned upon an Order of Reference issued by the

Honorable Ursula Ungaro, United States District Judge, pursuant to 28 U.S.C. § 636 [D.E. 14].

The Order of Reference directed the undersigned to take all necessary and proper action as

required by law with respect to Defendant Alberto Antonio Rodriguez's ("Rodriguez") Motion

Pursuant to 18 U.S.C. § 4241(c) for an Evidentiary Hearing to Determine Competency

(hereafter, "Motion for Competency Hearing") [D.E. 12, filed under seal].  For the reasons stated

below, the undersigned finds by a preponderance of the evidence that, after undergoing

competency restoration treatment, Rodriguez is competent to stand trial.

### CRIMINAL CHARGES AGAINST RODRIGUEZ

Rodriguez has been charged with the following child pornography offenses by way of an

indictment returned on December 2, 2014:

Count 1:     Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2) & (b)(1) on or about September 13, 2014.

Counts 2-5:     Access with Intent to View Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) & (b)(2) on July 26, 2013, April 12, 2014, April 23, 2014, and September 13, 2014.

Count 6:     Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(b) & (b)(2) on or about September 16, 2014.

See Indictment [D.E. 1].  The background facts for these charges are found in the materials submitted by the government as a supplement to the evidentiary record for the hearing held by the undersigned on October 13, 2015, which are being filed as Court Exh. 1.  They consist of a memorandum authored by Assistant United States Attorney Johnathan Kobrinski ("AUSA Kobrinski") on December 19, 2014, along with supporting documentation.

The charges against Rodriguez arise from an investigation conducted by government agents in April, 2014, which identified a computer user whose shared folders in the "ARES P2P" file sharing internet network contained suspected child pornography.  The computer's internet protocol ("IP") address was traced to the home where Rodriguez lived with his mother ("Mrs. Rodriguez") and his father ("Mr. Rodriguez").  On September 16, 2014, government agents executed a search warrant at the home.  Two laptop computers, one found in Rodriguez's bedroom (the "Toshiba laptop") and one in Mr. Rodriguez's bedroom (the "H-P laptop"), were recovered. Upon forensic examination, both computers yielded evidence of child pornography materials.

At the time of execution of the search warrant, the agents questioned Rodriguez, Mr. Rodriguez and Mrs. Rodriguez.  Upon questioning, Mr. Rodriguez admitted that he had found child pornography in his son's computer approximately a year or two earlier.  Mr. Rodriguez told the agents that his son had a learning disability and autism.  When she was questioned, Mrs. Rodriguez stated that her son was mildly autistic with delayed development and admitted being aware that her son viewed pornography.  Prior to questioning him, the agents advised Rodriguez of his *Miranda* rights, which he waived.  In an abundance of caution, they asked Rodriguez to explain what the right to remain silent meant to him, to which he responded that it meant he did

not have to talk to the agents.  Although the agents perceived Rodriguez as responsive to their questions, they noted that he displayed behavior consistent with some type of social disorder or awkwardness.  Rodriguez stated that he understood child pornography to mean "kids and sex" and that he knew it was illegal, meaning he "shouldn't be doing it" because "it's a crime."  He admitted that he had also viewed child pornography on the "Shareeza P2P" file sharing internet network.  He stated that he deleted the child pornography files he downloaded because his father checked on his computer.  He also told the agents that he had engaged in internet chats with other users discussing children having sex with adults or parents via the website "Kidschat."

Forensic examination of the Toshiba laptop revealed a history of the following browser keyword search terms: "dad grope child," "child grope," "little boy gay," "Gay Pedo," and "little boy on lap."  The "ARES P2P" download history revealed 49 complete downloads and 14 partial downloads of video files with titles indicative of child pornography content, as well as distribution of 16 such files.  In addition to a number of deleted files and images, three undeleted files and one image were recovered, all depicting child pornography.  Forensic examination of the H-P laptop revealed a history of the following browser keyword search terms: "toddler boy" and "6yo boy date rape."  The ARES P2P download history revealed 99 complete downloads and 25 partial downloads of video files with titles indicative of child pornography content, as well as distribution of 108 such files.  Eleven deleted child pornography video files and 189 deleted images were also recovered.

Finally, a number of text based Skype chat sessions were found for the account "animexxxd," whose profile information matched Rodriguez's date of birth, and additional chats were found for the account "akberto ross."  Some of the animexxxd chats specifically referenced sexual intercourse with minors and show the sharing of child pornography files.  In one of the

3

chats, animexxxd gives directions to his chat partner on what sexual molestation to perform on the partner's brother and 8 year old sister.  With a different chat partner, animexxxd engaged in discussions regarding the latter's use of a baby for sex.  At one point, animexxxd asks this chat partner, "if I was in ur state would u invite me to ur place?" and, after a response of "Yes," animexxxd asks "cool would u force me to live there or if I want to?"

In akberto ross' Skype chats, he uses the expressions "true nothings perfect" and "almost a utopia heh."  He also asks the chat partner, who appears to be from the U.K., "so nothing dangerous happening there compare to urs right?" and "has anything interesting happen in ur country dont see articles bout ur i guess its somewhat peaceful there lucky u\."  The chat also shows a discussion of gun control in akberto ross's country versus the U.K.

## PROCEDURAL BACKGROUND

As previously noted, the indictment against Rodriguez was returned on December 2, 2014 [D.E. 1].  Rodriguez's counsel, Joel Hirschhorn, Esq. ("Hirschhorn") entered an appearance on his behalf on December 3, 2014 [D.E. 3].  Rodriguez's initial appearance took place on December 4, 2014 before United States Magistrate Judge Edwin G. Torres ("Magistrate Judge Torres") [D.E. 4].  After a detention hearing held on the same day, Magistrate Judge Torres denied the government's request for pretrial detention and granted Rodriguez a $50,000 personal surety bond, subject to a number of restrictive conditions, including 24-hour home confinement [D.E. 4, 6].  At the December 4th hearing, Hirschhorn proffered a neuropsychological report that had been prepared by Dr. Jacqueline C. Valdes ("Dr. Valdes") on October 30, 2014, in which Rodriguez was diagnosed with Autism Spectrum Disorder/High Functioning Autism and borderline intellectual capabilities [D.E. 7 at 53, filed under seal].  Dr. Valdes noted that competency had not been formally assessed during her examination, and recommended a

4

separate evaluation involving Rodriguez's overall competency. Id. at 55. Given this recommendation, Magistrate Judge Torres noted that the parties would be filing a joint motion for competency evaluation and that arraignment would be held at a later date [D.E. 4].[1]

On December 12, 2014, the parties filed a Joint Motion for Determination of Defendant's Mental Competency Pursuant to 18 U.S.C. 4241 [D.E. 8]. On December 17, 2014, the Court entered an Order for Psychological Examination to Determine Competency of Defendant [D.E. 9]. The Court directed that: "An examination of the Defendant's mental condition shall be conducted [] by Doctor Bruce Frumkin [('Dr. Frumkin')] to determine whether he is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. 18 U.S.C. §§ 4241 and 4247(b)." Id. at 1.

Dr. Frumkin's report of the competency examination of Rodriguez that he conducted on December 30, 2014 was filed on January 12, 2015 [D.E. 11-1, filed under seal]. Dr. Frumkin opined:

> I believe when I questioned Mr. Rodriguez about the legal system and gave him tests to better assess what he understood, he exaggerated the lack of understanding he did have.
>
> If found incompetent, it is doubtful that he can be made competent in the foreseeable future. Although he can be taught about the legal system, his deficits in his ability to assist defense counsel is based on his Autism Spectrum Disorder and is unlikely to change.

Id. at 8-9. In a follow-up email, Dr. Frumkin stated, "I do not believe he meets criteria for competency to stand trial." [D.E. 23-1, filed under seal].

Pursuant to the Court's referral order, the undersigned conducted an initial hearing on the Motion for Competency Hearing on March 10, 2015 [D.E. 21]. At the hearing, the parties

---

[1] Rodriguez has not yet been arraigned.

stipulated and the undersigned found by a preponderance of the evidence that Rodriguez was not competent to proceed to trial, relying on Dr. Valdes' and Dr. Frumkin's reports.  See Order Re: Competency [D.E. 22].

On March 23, 2015, the Court ordered that Rodriguez be permitted to voluntarily surrender to the custody of the Attorney General for evaluation of his mental competency to stand trial and treatment for restoration thereof, pursuant to 18 U.S.C. § 4241(d).  See Agreed Order and Recommendation for Commitment for Competency Evaluation and Treatment [D.E. 24].  On August 11, 2015, the Warden of the Federal Medical Center at Butner, North Carolina ("FMC Butner") submitted a report of Rodriguez's mental competency evaluation and treatment at that facility conducted by Capt. Carlton Pyant ("Dr. Pyant") [D.E. 37, filed under seal]. Therein, the Warden reported that, in the opinion of his evaluators, Rodriguez is now competent to stand trial.  Id.  On October 13, 2015, the undersigned held an evidentiary hearing on this matter at which Dr. Pyant, Dr. Valdes and Michael E. Rappaport ("Dr. Rappaport") testified. Rodriguez also testified at the hearing.

## APPLICABLE LAW

"The due process clause of the Constitution prohibits the conviction of an incompetent defendant."  U.S. v. Rinchack, 820 F.2d 1557, 1569 (11th Cir. 1987) (citing Pate v. Robinson, 383 U.S. 375 (1966); Davis v. Wyrick, 766 F.2d 1197, 1201 (8th Cir. 1985)).  For an impaired defendant "to stand trial, consistent with notions of due process, he must be able to satisfy the ordinary competency standard: that is, he must be able to consult with his lawyer with a reasonable degree of rational understanding and have a rational as well as factual understanding of the proceeding against him."  Id. (citing Dusky v. U.S., 362 U.S. 402 (1960); U.S. v. Rodriguez, 799 F.2d 649, 654 (11th Cir. 1986); U.S. v. Mota, 598 F.2d 995, 998 (5th Cir.

1979)).[2]

In <u>U.S. v. Duhon</u>, 104 F. Supp. 2d 663 (W.D. La. 2000), the court interpreted a post-<u>Dusky</u> case, <u>Drope v. Missouri</u>, 420 U.S. 162 (1975), as adding a new prong to the <u>Dusky</u> standard, namely, that a defendant must be able to "assist in *preparing* his defense." <u>Id.</u> at 670 (citing <u>Drope</u>, 420 U.S. at 171) (emphasis added). In <u>Drope</u>, however, the Supreme Court restated the <u>Dusky</u> standard verbatim. <u>Drope</u> 420 U.S. at 172 ("Accordingly, as to federal cases, we have approved a test of incompetence which seeks to ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'") (quoting <u>Dusky</u>, 362 U.S. at 402). Thus, nothing in <u>Drope</u> supports the <u>Duhon</u> court's engrafting on the <u>Dusky</u> standard a defendant's ability to "assist in *preparing* his defense." <u>See</u> <u>U.S. v. Merriweather</u>, 921 F. Supp. 2d 1265, 1301-02 & n.52 (N.D. Ala. 2013) (rejecting the <u>Duhon</u> court's interpretation of <u>Drope</u> and stating, "Nowhere in *Drope* did the Supreme Court modify or replace the *Dusky* Standard, so *Dusky* remains the standard that this court must follow today.").

In making a competency determination, a "court may consider the testimony of medical experts to establish facts; however, it may not abdicate its duty to reach the ultimate determination of a defendant's competency to stand trial." <u>Merriweather</u>, 921 F. Supp. 2d at 1303. "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges. Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational

---

[2]   In <u>Dusky</u>, the United States Supreme Court first formulated the competency standard as follows: "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." <u>Dusky</u>, 362 U.S. at 402.

behavior can be equated with mental incompetence to stand trial." Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995) (citations omitted).   In U.S. v. Hogan, 986 F.2d 1364 (11th Cir. 1993) the Eleventh Circuit affirmed the trial court's finding that "the minor defects in Hogan's cognitive abilities did not render him incapable of providing rational assistance to his attorney." Id. at 1373.   The Eleventh Circuit commented, "[e]ven perfectly competent defendants often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers. That level of comprehension is not a requirement of competency.   All that is required is that [the defendant have] a rational as well as a factual understanding of the proceedings against him and [have] sufficient present ability to consult with his attorney with a reasonable degree of rational understanding."   Id.   See also Merriweather, 921 F. Supp. 2d at 1307 n.62 ("The *Dusky* standard, as commentators have noted, does not require that a defendant have a high level of ability or performance.   After all, a defendant surely does not have to be as intelligent and reasonable as his lawyers to be competent to stand trial.") (citing Note, Incompetency to Stand Trial, 81 Harv. L. Rev. 454, 458 (1967)).[3]

The statutory framework for determining competency is found at Title 18, United States

---

[3] The pertinent portion of the Harvard Law Review comment reads:

> As a practical matter, of course, these considerations cannot require that every defendant have "a high degree of performance capacity." Incompetency must be a relative judgment which takes into account the average level of ability of criminal defendants. Many defendants lack the intelligence or the legal sophistication to participate actively in the conduct of their defense. But enlarging the class of persons considered incompetent to stand trial to include all such defendants would fundamentally alter the administration of the criminal law. The standard of rational understanding emphasized in *Dusky* must be taken to mean no more than that the defendant be able to confer coherently with counsel and have some appreciation of the significance of the proceeding and his involvement in it. Many defendants who have some intellectual or physical handicap or emotional disturbance preventing them from functioning at their normal level of effectiveness can still meet such a standard. The question is one of degree; the purpose of the law is not to attempt to compensate all the inevitable disparities in innate abilities among defendants, but to identify those instances where the purposes of incompetency law are most directly relevant.

Id.

Code, Section § 4241, which provides:

**(a) Motion to determine competency of defendant.**--At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

**(b) Psychiatric or psychological examination and report.**--Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247 (b) and (c).

**(c) Hearing.**--The hearing shall be conducted pursuant to the provisions of section 4247(d).[4]

**(d) Determination and disposition.**--If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—

　　**(1)** for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and

　　**(2)** for an additional reasonable period of time until—

　　　　**(A)** his mental condition is so improved that trial may proceed, if

---

[4] Section 4247(d) provides:

At a hearing ordered pursuant to this chapter the person whose mental condition is the subject of the hearing shall be represented by counsel and, if he is financially unable to obtain adequate representation, counsel shall be appointed for him pursuant to section 3006A. The person shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing.

18 U.S.C. § 4247(d).

the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or

**(B)** the pending charges against him are disposed of according to law;

whichever is earlier.

If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit the proceedings to go forward, the defendant is subject to the provisions of sections 4246 and 4248.

**(e) Discharge.**--When the director of the facility in which a defendant is hospitalized pursuant to subsection (d) determines that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. The clerk shall send a copy of the certificate to the defendant's counsel and to the attorney for the Government. The court shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine the competency of the defendant. If, after the hearing, the court finds by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense, the court shall order his immediate discharge from the facility in which he is hospitalized and shall set the date for trial or other proceedings. Upon discharge, the defendant is subject to the provisions of chapters 207 and 227.

18 U.S.C. § 4241.

## HEARING TESTIMONY

As previously noted, the following witnesses testified at the October 13, 2015 hearing:

Dr. Pyant (via teleconferencing), Dr. Valdes, Rodriguez, and Dr. Rappaport.

### A.   *Dr. Pyant*

1.     Dr. Pyant has been employed as a forensic psychologist at FMC Butner for the

past 15 years.  As part of his duties, he performs competency evaluations on a routine basis.

2.     Dr. Pyant conducted an initial screening upon Rodriguez's arrival at FMC Butner

on April 9, 2015 and determined that Rodriguez could be appropriately placed in the general

mental health housing unit.

3.     During this initial interaction, Dr. Pyant observed that Rodriguez had some difficulties with his speech and Dr. Pyant had some difficulties understanding what Rodriguez was saying.  Dr. Pyant felt that this was due to the way Rodriguez was pronouncing words.

4.     The next step in the process was a team meeting attended by Rodriguez, Dr. Pyant, a social worker, a psychiatrist (if one was needed), and nursing staff.  At that team meeting, the evaluation process was discussed with Rodriguez.

5.     Dr. Pyant also conducted clinical interviews of Rodriguez at which competency-related issues were addressed.  Additionally, Rodriguez was referred to a competency restoration group led by social workers.

6.     Over time, the initial difficulties with Rodriguez's speech lessened and Dr. Pyant was able to understand Rodriguez more clearly and Rodriguez was able to respond to the questions that Dr. Pyant was asking him.  Also, the facilitator of the competency restoration group reported that Rodriguez participated and was an active member of the group.

7.     After the competency restoration sessions, Dr. Pyant administered psychological tests to Rodriguez, including the Inventory of Legal Knowledge ("ILK"), which does not assess competency but asks competency-related questions.

8.     Dr. Pyant explained that the ILK consists of 61 true or false questions relating to the legal process, and requires the subject to maintain concentration and attention, and focus auditorily on the information being presented.[5]

9.     The results of the ILK administered by Dr. Pyant, a score of 52, were dramatically different from those obtained by Dr. Frumkin, a score of 28, with the cutoff being 47.

---

[5] Dr. Pyant gave two examples of the questions in the ILK:  (1) "A person charged with a crime is called the defendant. True or false?" (2) "A defendant might plead guilty to get less time. True or false?"

10.     In Dr. Pyant's view, the ILK score achieved by Rodriguez at FMC Butner demonstrated that he was motivated and that he would more than likely respond in a genuine and honest manner to other measures assessing his competency.[6]

11.     Dr. Pyant also administered the Competence Assessment for Standing Trial for Defendants with Mental Retardation ("CAST-MR"), because Dr. Valdes had previously assessed Rodriguez's IQ at 73, which falls in the borderline range of intellectual function.[7]

12.     The CAST-MR consists of three domains: basic legal concepts; skills to assist defense; and understanding case events.

13.     The domain of basic legal concepts is presented in a multiple choice format. Statements are read to the test taker along with three choices from which to select the one that best completes the statement.  Rodriguez scored 24 out of 25 in this domain.

14.     The domain of skills to assist defense is also presented in a multiple choice format, with statements read and three choices available.  Rodriguez obtained a perfect score of 15 in this domain.

15.     The domain of understanding case events is not presented in a multiple choice format.  The test administrator asks questions about the case itself and records the test taker's responses.  According to Dr. Pyant, responding to the questions in this domain requires a high level of verbal skills.  Rodriguez scored 8 out of 10 in this domain.[8]

---

[6]   Dr. Pyant specifically testified that, in contrast to Dr. Frumkin's report, he found no indicia of malingering on the part of Rodriguez.

[7]   On cross-examination, Dr. Pyant recognized that, taking into account the applicable 5% margin of error, Rodriguez's IQ range is 68 to 79.  An IQ range of 71 to 84 represents borderline intellectual disability, while 70 and below scores represent intellectual disability.

[8]   Dr. Pyant provided the following questions and answers as examples:

Q.  "What were you doing that caused you to be arrested?"

A.  "The police thought I was watching child porn.  The police questioned all of us, me and my parents, and about a week later I was arrested."

Q.  "How many other people were there and who were they?"

16.     Rodriguez's overall score in the CAST-MR was 47, which, according to Dr. Pyant, is consistent with someone with no mental retardation[9] who is competent to stand trial.[10]

17.     Due to Rodriguez's history of a deficit with social communication, Dr. Pyant also administered the Revised Competency Assessment Instrument ("R-CAI"), which required Rodriguez to use more verbal skills.  The test measures 14 areas related to competency to stand trial.

18.     The questions and answers for these areas of the R-CAI were as follows:

Q. What are you charged with?
A.  Possession of child porn.
Q. Is this a felony or misdemeanor?
A.  A felony.
Q. Which is more serious?  A felony or a misdemeanor?
A.  A felony.
Q.  If you're found guilty as charged, what are the possible sentences the judge could give you?
A.  Maybe five years.  I'm not sure.
Q.  Well, where would you serve such a sentence?
A.  Federal prison.
Q.  What does probation mean?
A.  Community supervision.
Q.  What are some of the conditions a person must follow on probation?
A.  Can't have weapons, do drugs or alcohol. Can't leave the state.  Can't go to certain places and ankle monitoring.
Q.  What happens if a person is found not guilty?
A.  You are released.
Q.  Where do they send people not found guilty by reason of insanity?
A.  A mental health facility.
Q.  What pleas can a person enter in court?
A.  Guilty, not guilty, not guilty by reason of insanity.
Q.  Well, what does not guilty mean?
A.  You're innocent.

---

A.  "Me, my mom and dad were home.  My mom and dad and uncle took me to the police station about a week later after they came to the house.  I self-surrendered."

[9]   Prior references to the term "mental retardation" in federal law have been changed to "intellectual disability" by operation of Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010).

[10]   According to Dr. Pyant, a score of 25.6 or lower in the CAST-MR indicates that the test taker is mentally retarded (has an intellectual disability) and is incompetent to stand trial.  A score between 25.6 and 37 indicates that the test taker is mentally retarded (has an intellectual disability) but is competent to stand trial.

Q.  What does guilty mean?
A.  That you did the crime.
Q.  What does not guilty by reason of insanity mean?
A.  Mental illness, but not taking medication.
Q.  Well, what does the public defender do?
A.  Could help with my case.
Q.  What does the district attorney do?
A.  To find you guilty.
Q.  What does the Judge do?
A.  Decides the case.
Q.  What does the jury do?
A.  Decides if you're guilty or not guilty?
Q.  Who is the Defendant in your case?
A.  I am the Defendant.
Q.  What is your role as the Defendant?
A.  I help my lawyer.
Q.  What do witnesses do?
A.  Describe the crime they saw.
Q.  Do Defendants have to testify in their own cases?
A.  No.
Q.   If you have to testify in your case, will you have to tell everything that happened?
A.  Yes.
Q.  If you testify, who asks you questions first?
A.  Your lawyer.
Q.  Then who can ask you questions?
A.  The prosecutor.
Q.  What is the district attorney trying to do?
A.  To prove you're guilty.
Q.  What would you like to be the outcome of the trial?
A.  To be released and have the charges dropped.
Q.  What evidence do they have against you?
A.  Computers.
Q.  Well, what does evidence mean?
A.  It helps or not helps your case.
Q.  What is a plea bargain?
A.  Pleading guilty for a lesser time.
Q.  Well, what plea do you have to make to get a plea bargain?
A.  Guilty.
Q.  What does confidentiality mean?
A.  It can't be talked about anywhere else.
Q.  How can you help your lawyer?
A.  Giving him information.
Q.  What can you do if you disagree with your attorney?
A.  Get another lawyer and ask the Judge.
Q.  What does the police report say that you did?

A.  I had possession of child porn.
Q. What led the police to arrest you?
A.  Don't know.
Q. Did you confess?
A.  No.
Q.  What should you do if a witness tells a lie about you in the courtroom?
A.  Tell my lawyer.
Q.  What should you do if you do not understand what a witness is saying?
A.  Tell my lawyer.
Q.  How are you expected to act in court?
A.  Sit down and listen.
Q.  When can you speak in the courtroom?
A.  When the judge gives you permission.
Q.  What do you think would happen if you spoke out and moved around in the courtroom without permission?
A.  It would hurt your case.
Q.  Have you ever had difficulty behaving right in court.
A.  No.

19.    Dr. Pyant's assessment of Rodriguez's performance on the R-CAI was that he answered the questions correctly, consistently and concisely, and performed excellently.  Dr. Pyant did acknowledge that Rodriguez has some deficits in his ability to express himself due to issues with his language.   There were times when Dr. Pyant had to ask Rodriguez to repeat his answers because he couldn't quite understand what Rodriguez was saying, but by doing that he was able to record Rodriguez's responses.

20.    The ILK, CAST-MR and R-CAI were administered to Rodriguez in July, 2015, three months after his arrival at FMC Butner.  Dr. Pyant perceived that Rodriguez was eager to be tested after participating in the competency restoration classes.

21.    Dr. Pyant's assessment of Rodriguez, as reflected in his Forensic Evaluation Report is that he has autism spectrum disorder with accompanying intellectual impairment and language impairment.  In his testimony, Dr. Pyant noted that Dr. Valdes' report mentioned "high functioning" and he opined that, based on his observations, Rodriguez is probably more high

functioning than most people with autism.[11]

22.     The undersigned found that Dr. Pyant was qualified as an expert in the field of forensic psychology.  The undersigned finds Dr. Pyant's testimony to be competent, credible and unbiased.

23.     The opinion rendered by Dr. Pyant was as follows:  Rodriguez does not suffer from a mental disease or defect preventing him from having a factual, rational understanding of the proceedings and assisting his attorney in his defense; hence, Rodriguez is competent to participate in the legal proceedings and to assist in his defense.

24.     On cross-examination, Hirschhorn asked Dr. Pyant if any questions were asked of Rodriguez relating to his ability to participate in providing information in response to a presentence investigation report, such as "Do you know what a presentence investigation is?" to which Dr. Pyant responded "No."  Hirschhorn then asked Dr. Pyant if he would agree that reviewing a presentence investigation report, all 90-something paragraphs, and trying to figure out the guidelines and motions for downward departure and motion for variance would be a daunting task for someone like Rodriguez, to which Dr. Pyant responded that it would be a daunting task for any defendant, whether or not they have autism or any mental condition, and in essence, difficult for most defendants.

25.     On cross-examination, Dr. Pyant also explained that participants in the FMC Butner competency restoration group typically meet once a week and review test questions, do

---

[11]   Dr. Pyant compared Rodriguez's case with that of an earlier autism case he had handled at FMC Butner.  That individual had to be housed in a restricted housing unit, demonstrated impulsivity, had deficits in self-care, had severely limited abilities to communicate with others, engaged in stereotypical behavior of putting his hands on his head, constantly rubbing it and twirling around, walked slowly and tried to place each foot in the same spot, was socially withdrawn and did not interact with people, and was hypersensitive to touch, so that correctional staff had to use extreme caution when they approached him. By contrast, Rodriguez was in the general mental health population, was independent in self-care, maintained his hygiene, interacted with his peers, and was respectful towards staff.

role-play and talk about different scenarios. While he recognized that the curriculum's basic component is repetition of what the participant has to learn for his competency to be restored, he opined that Rodriguez's performance in the tests administered in July, 2015 was not based simply on rote memory. According to Dr. Pyant, based on his test responses, Rodriguez clearly had a good grasp of the information. Further, based on those responses, which showed that Rodriguez both remembered the information and was able to articulate it, Dr. Pyant opined that Rodriguez is currently competent.[12]

**B.    *Dr. Valdes***

26.    Dr. Valdes has worked as a clinical neuropsychologist for approximately 23 years.

27.    Dr. Valdes is part of a team of psychologists for the Center for Autism and Related Disorders ("CARD"). The team has monthly meetings to discuss approaches and evaluative measures to determine appropriate resources and diagnosis of children with autism spectrum disorder, as well as available resources for them in the community.

28.    About a third of Dr. Valdes' practice involves forensic neuropsychological work assessing patients in connection with litigation, mostly civil but some criminal.

29.    In her work as a clinical neuropsychologist, Dr. Valdes sees children with autism spectrum disorder, developmental disabilities, and generally suffering from neurologically based impairments. Approximately 25% of the children she sees suffer from autism spectrum disorder.

30.    Dr. Valdes conducted tests and evaluated Rodriguez over four six-hour sessions and rendered a report on October 30, 2014 wherein she diagnosed Rodriguez with autism

---

[12]  Dr. Pyant testified that, contrary to Rodriguez's counsel's proposition, Rodriguez's competency would not "ebb and flow."

spectrum disorder.[13]

31.     Dr. Valdes does not conduct evaluations to determine competency to stand trial. She was qualified to testify as an expert regarding her evaluation and diagnosis of Rodriguez.

32.     Dr. Valdes' opinion is that Rodriguez has high-functioning autism, and that earlier diagnoses of attention deficit disorder and learning disorder that were made when Rodriguez was in school were not correct.[14]

33.     Rodriguez is high functioning because he is able to complete activities of daily living, like dressing and simple self-care.  From the intellectual standpoint however, he falls in the bottom 3 to 5 percent of his age peers, with an IQ of 73.

34.     According to Dr. Valdes, Rodriguez clearly evidenced a significant communication deficit, which is one of the key factors in making a diagnosis of autism spectrum disorder.  Sometimes his words were mumbled; the volume was low; there were articulation problems or he would speak very quickly, with almost a staccato quality to the speech; and it was difficult to understand what he was saying.  Additionally, Rodriguez does not look a person in the eye when speaking to him or her.

35.     On testing, Rodriguez's ability to express himself was more consistent with those of an 11 year old rather than his chronological age of 23.  Similarly, his ability to comprehend language was equivalent to that of a 12-year-old.  Additionally, when Dr. Valdes interacted with

---

[13]   According to Dr. Valdes, Rodriguez required double the normal amount of time for testing and evaluation; but, like Dr. Pyant, Dr. Valdes found no evidence of malingering by Rodriguez.

[14]   Dr. Valdes reviewed Rodriguez's school records and noted that he was identified as having disabilities requiring intervention even before school started.  He was placed in special classes, was unable to pass the State of Florida standardized grade promotion test ("FCAT") and eventually received a special high school diploma.  In Dr. Valdes' opinion, the grades of C Rodriguez received in high school math courses were inconsistent with his tested abilities.  Dr. Valdes attributed the grades in part to homework help Rodriguez was receiving at home from his mother and sister.

  Defense counsel supplemented the evidentiary record with Rodriguez's preschool and elementary school records, which are being filed as Court Exh. 2.

Rodriguez: it was oftentimes difficult to understand what he was saying; he clearly misunderstood questions; he would provide very concrete responses that sometimes were unrelated to the question at hand; he demonstrated a clear lack of knowledge in terms of what was being asked of him; questions would need to be re-asked; he required additional aids, such as providing visual demonstrations, so he could understand the questions.

36.     With regard to academic achievement measures, Rodriguez scored in the second to fourth grade levels in all areas, including math, reading, phonics, sentence and essay writing, and language functioning.

37.     Additionally, if Rodriguez hears something once, his ability to recall that information is at the bottom one percent of the population.  However, if asked to learn rote information that he hears over and over again, his performance is high average.

38.     Dr. Valdes also opined that, because Rodriguez requires additional time to process information, he would not be able to keep up with the pace of a trial.

39.     Although she did not conduct a competency evaluation as was not qualified in that field, Dr. Valdes testified as follows regarding the results obtained by Dr. Pyant.  Individuals with autism spectrum disorder have excellent rote memory but lack insight and the ability to make generalizations.  It was Dr. Valdes' opinion that Rodriguez would be able to state back information repeated to him over and over again in a competency restoration group, but without comprehension or understanding such information.

40.     According to Dr. Valdes, Rodriguez sees language and communication as very literal in nature.  Whatever somebody would tell him, he would take that exactly at face value and in a very literal black-and-white fashion.  Dr. Valdes gave as an example the phrase "hit the road" as meaning to Rodriguez that he should hit the road with his hand, not pick up and leave.

Another example given by Valdes was that an allusion to a "fork in the road" would prompt Rodriguez to look for a fork, as a utensil, in the road.

41.     In terms of social cognition measures, Rodriguez would miss the sarcasm in the phrase "Yeah. I really like you" based on the speaker's intonation.  So, according to Dr. Valdes, Rodriguez would not be able to accurately read jurors and communicate his perceptions about them to his lawyer.

42.     Upon questioning by the undersigned, Dr. Valdes assisted in clarifying Rodriguez's level in the range of autism spectrum disorder individuals as follows:  At the most critical level are those individuals who self-injure; then come those who are unable to care for themselves; then those, like Rodriguez, who can care for themselves but have intellectual difficulties; then those without intellectual difficulties.   According to Dr. Valdes, given his intellectual level, Rodriguez can be taught an overlearned task and function in such a capacity (like being a runner in an office).

43.     The undersigned found Dr. Valdes to be truthful and sincere in her testimony, which was helpful in terms of elucidating Rodriguez's abilities and limitations.  However, as previously noted, Dr. Valdes did not conduct an evaluation as to Rodriguez's competency to stand trial.[15]

### C.     Rodriguez

44.     Rodriguez was able to answer the questions posed by Hirschhorn and AUSA Kobrinski, although most of his answers were a single word or a single sentence.  His speech was clipped and monotone but could be understood.

45.     When asked by Hirschhorn what a jury is he answered, "A group of people that

---

[15]   Dr. Valdes testified that her services to Rodriguez have been on a *pro bono* basis, for which the undersigned complimented her.

decides if you are guilty or not."

46.     Hirschhorn also asked Rodriguez what kind of jurors he would like to sit in his case to which Rodriguez answered, "I'm not sure.  Not sure."  Hirschhorn insisted:

Q.  Well, young?  Old?
A.  I don't know.
Q.  White?  Black?
A.  I don't know.
Q.  Spanish?  Men?  Women?  Any idea?
A.  No.  Not me.

47.     When asked by Hirschhorn if he understood what Dr. Pyant was saying in his testimony, Rodriguez answered, "A little bit."

48.     In an effort to demonstrate his client's lack of math skills, Hirschhorn asked him a purported algebra question and asked him to draw a triangle.  The algebra question was along the lines of: If a equals 1 and b equals 2, and if we add a and b, how much is c.  However, there was no value to this exercise since Hirschhorn did not define c.   With regard to the triangle, Rodriguez was able to draw one.

49.     Rodriguez admitted to AUSA Kobrinski having installed file sharing programs in his and his father's computers and having engaged in Skype chats, but could not recall the chat partner name akberto ross.

50.     When asked by AUSA Kobrinski what is child pornography, Rodriguez replied, "Underaged porn."

51.     Rodriguez recalled attending seven classes at FMC Butner and guessed he did OK on the tests administered to him because Dr. Pyant told him he got a few questions wrong.

52.     The undersigned found Rodriguez's testimony to be candid.

**D.     *Dr. Rappaport***

53.     Dr. Rappaport has been declared an expert in forensic psychology numerous times

and in numerous jurisdictions.   Twenty percent of his current practice is devoted to juvenile competency evaluations.   The undersigned accepted Dr. Rappaport as an expert in the field of competency evaluations.

54.   Dr. Rappaport saw Rodriguez both before and after Rodriguez went to FMC Butner.   Like Dr. Pyant and Dr. Valdes, Dr. Rappaport found no evidence of malingering by Rodriguez.

55.   Dr. Rappaport conducted what he termed structured interviews and generated nine pages of notes but did not administer any standardized tests.   He did conduct a serial 7s test, which requires counting backwards from 100 by 7s.   Rodriguez was not able to do it.

56.   Dr. Rappaport saw Rodriguez a total of six times but he only recorded notes on March 3, 2015 and September 3, 2015.   Dr. Rappaport characterized his notes as his evaluation form to determine competency.   All of the notes were on the same document.   The notes pertaining to March 3rd appear in a lighter color and those pertaining to September 3rd appear in a darker color.

57.   Upon review of Rodriguez's school records, Dr. Rappaport concluded that Rodriguez was mainstreamed because he is so well behaved but his high school grades do not comport with his academic abilities.

58.   According to Dr. Rappaport, Rodriguez has a code for speaking whereby: "I'm not sure" mean "no;" "I guess" literally means he's guessing; "not really" means "no" or "never;" "I think so" means "yes;" "yes" means "yes;" "I don't know" means "no" or "I don't know" or "I'm embarrassed" or he can't do what's been asked.   When uncomfortable about answering a question, he says "ask my mother."

59.   Dr. Rappaport's opinion is that Rodriguez is not competent to stand trial and

cannot be restored to competency.

60.     Dr. Rappaport relied for his opinion that Rodriguez is not competent on Rodriguez's inability to give an adequate past history and to understand the severity of what he is facing.

61.     According to Dr. Rappaport, Rodriguez has three defects: very low intelligence (IQ of 73); severe speech pathology; and autism, which make communication with his counsel almost impossible.

62.     Dr. Rappaport does not believe that Rodriguez can make a rational decision whether to go to trial or plead guilty; and if he goes to trial whether he can adequately assist counsel in the jury selection process.  According to Dr. Rappaport, Rodriguez's memory and intelligence are not adequate to help his attorney in his defense.

63.     On cross-examination, Dr. Rappaport agreed that not everyone who has autism spectrum disorder is incompetent to stand trial.  However, in Dr. Rappaport's opinion, the combination of autism, low IQ and severe verbal productivity problem, as found in Rodriguez, renders a person incompetent, even if high functioning.

64.     When asked by the undersigned, Dr. Rappaport testified that Rodriguez is not capable of extrapolation, inferences or generalizations and is only capable of speaking in concrete terms and repeating things by rote.  When the undersigned pointed out that Rodriguez had been able to answer Hirschhorn's and AUSA Kobrinski's questions on the stand, Dr. Rappaport conceded that Rodriguez is capable of answering simple questions but without being creative or insightful.

65.     When confronted with the fact that Rodriguez had answered the question of what a jury is, Dr. Rappaport drew a distinction between a literal understanding and a figurative

understanding of the law.

66.     When asked to give an example of an incoherent response given by Rodriguez on the stand, Dr. Rappaport was unable to do so, other than to reference to Rodriguez's mumbling. But, as noted before, Rodriguez's speech could be understood.

67.     The undersigned assigns low credibility and value to Dr. Rappaport's testimony and opinion.  He testified that from the first time he saw Rodriguez he determined that Rodriguez was not competent, without conducting any standardized tests; his evaluation form to determine competency consists of notes taken on two different occasions that can only be distinguished by the darkness of the writings; in trying to explain obvious facts, such as that Rodriguez was able to testify what a jury is, he drew a contrived distinction between literal and figurative understandings of the law; and he seemed to believe that being competent to stand trial requires creativity and insightfulness.[16]

## DISCUSSION

As previously noted, the competency standard requires a finding by the preponderance of the evidence that the defendant understand the nature and consequences of the proceedings against him and that he be able to assist properly in his defense.  18 U.S.C. § 4241(d); Dusky, 362 U.S. at 402.  Having considered the evidence presented at the October 13th hearing, the undersigned finds that Rodriguez meets this standard.

The undersigned found the testimony of Dr. Pyant to be competent, credible and unbiased.  Therefore, the undersigned accepts and adopts his opinion that, after restoration treatment at FMC Butner, Rodriguez meets the competency standard, hence is competent to participate in the legal proceedings and to assist in his defense.

---

[16]  The undersigned did compliment Dr. Rappaport for rendering his services to Rodriguez on a *pro bono* basis.

With regard to Dr. Valdes, although the undersigned found her testimony to be truthful, sincere, and helpful, she did not conduct an evaluation as to Rodriguez's competency. With regard to Dr. Rappaport, the undersigned found his testimony and opinion to be low in credibility and value. Specifically, the undersigned rejects these experts' characterization of Rodriguez's competency restoration as being a mere rote exercise of short duration. At the October 13th hearing, Rodriguez testified candidly and was able to answer the questions posed by Hirschhorn and AUSA Kobrinski and be understood. He had no difficulty correctly answering his own counsel's question about what a jury is. He knew what child pornography is. He admitted having installed file sharing programs in his and his father's computers and having engaged in Skype chats.

Those Skype chats belie Dr. Valdes' and Dr. Rappaport's assessment that Rodriguez can only think in concrete terms without the capacity for extrapolation, inferences or generalizations. The animexxxd chats included directions to one chat partner on what sexual molestation to perform on the partner's brother and 8 year old sister, and discussions with another regarding the latter's use of a baby for sex. Clear evidence of Rodriguez's ability to think beyond the concrete here and now is animexxxd's question of his chat partner, "if I was in ur state would u invite me to ur place?" and, after a response of "Yes," animexxxd asks "cool would u force me to live there or if I want to?" Moreover, although he denied recalling the Skype name "akberto ross" on the stand, chats by that name found as a result of the government's forensic examination discussed such non-concrete subjects as gun control in different countries and included such non-concrete comments as "true nothings perfect" and "almost a utopia heh."

The undersigned also finds that defense counsel overshot the mark in his attempts to show that Rodriguez is not competent by posing questions regarding Rodriguez's ability to

decipher a pre-sentence investigation report, and his ability to decide which jurors to select at trial. As noted above, the standard does not require that a defendant be able to assist in <u>preparing</u> the defense, but be able to consult with his lawyer and assist in his defense. <u>Merriweather</u>, 921 F. Supp. 2d at 1301-02 & n.52. Also, as courts have noted, the standard does not require that defendants "fully comprehend the intricacies of some of the defensive theories offered by their lawyers," <u>Hogan</u>, 986 F.2d at 1373, or "have a high level of ability or performance," <u>Merriweather</u>, 921 F. Supp. 2d at 1307 n.62, or "be as intelligent and reasonable as his lawyers." <u>Id.</u> Indeed, as succinctly noted by the Eleventh Circuit, neither low intelligence nor mental deficiency "can be equated with mental incompetence to stand trial." <u>Medina</u>, 59 F.3d at 1107.

Thus, notwithstanding Rodriguez's established diagnosis of high functioning autism spectrum disorder and borderline intellectual function, the undersigned concludes that he meets the legal standard of competency to stand trial.

<u>**CONCLUSION**</u>

Having considered the testimonial and documentary evidence presented at the October 13, 2015 hearing, having heard the argument of counsel, and being otherwise fully apprised in the premises, the undersigned finds, by a preponderance of the evidence, that, after restoration treatment, Rodriguez is competent to stand trial.

**DONE AND ORDERED** this 10th day of November, 2015.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc: Honorable Ursula Ungaro
    Counsel of record